**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CARLOS FLORES, | ) | CASE NO. 1:17cv0406 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Carlos Flores ("Plaintiff" or "Flores"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. §1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons

set forth below, the Magistrate Judge recommends the Commissioner's final decision be

AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I. PROCEDURAL HISTORY

In June 2013, Flores filed an application for SSI alleging a disability onset date of June 21, 2013, claiming he was disabled due to carpal tunnel, back pain, liver problems, arthritis, depression and tendinitis. (Transcript ("Tr.") 232.) The applications were denied, and Flores requested a hearing before an administrative law judge ("ALJ"). (Tr. 101, 118)

On May 8, 2015, an ALJ held a hearing, during which Flores, represented by counsel, and an impartial vocational expert ("VE"), testified. (Tr. 28.) On May 28, 2015, the ALJ issued a written decision finding Flores was not disabled. (Tr. 28-39.) The ALJ's decision became final on February 7, 2017, when the Appeals Council declined further review. (Tr. 1.)

On February 28, 2017, Flores filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 11 & 13.) Flores asserts the following assignments of error:

> (1) The ALJ's assessment of Plaintiff's residual functional capacity is not supported by substantial evidence;
>
> (2) The ALJ erred in failing to include Plaintiff's illiteracy and inability to speak English in the hypothetical question to the vocational expert;
>
> (3) Material new evidence warrants remand.

(Doc. No. 11 at 1.)

# II. EVIDENCE

## A. Personal and Vocational Evidence

Flores was born in June 1974 and was 40 years-old at the time of his administrative hearing, making him a "younger person" under social security regulations. (Tr. 37.) *See* 20 C.F.R. §416.963(c). He has a limited education and is unable to communicate in English. (*Id.*)

He has past relevant work as a hand packager, gas station attendant, and construction worker II. (*Id.*)

**B.      Medical Evidence[2]**

**1.        Mental Impairments**

On January 11, 2013, Flores visited his primary care physician, Azra Shaikh, M.D., reporting depression due to his physical pain and inability to work.  (Tr. 335.)  On March 26, 2013, Dr. Shaikh noted Flores had been taking both Cymbalta and Paxil.  (Tr. 331.)  She advised Flores to only take Paxil and discontinue the Cymbalta.  (*Id.*)

Flores then received treatment at a mental health clinic from July 11 – August 21, 2013. (Tr. 454.)  His diagnoses were adjustment disorder with mixed anxiety and depressed mood, and rule out mood disorder due to general medical condition.  (*Id.*)  Flores discontinued treatment due to termination of his insurance plan.  (*Id.*)  His therapist, Irving Perez, M.A., noted Flores was receiving treatment "for depression and anxiety in the context of ongoing medical conditions and the loss of his job." (Tr. 429.)

 Flores underwent a consultative examination with Stanley E. Schneider, Ed.D., on November 6, 2013.  (Tr. 432.)  He reported anxiety, low energy, poor motivation, weight gain, and poor sleep.  (Tr. 433.)  He denied any psychiatric hospitalization, but indicated some outpatient mental health treatment.  (*Id.*)  Flores stated he obsessed over things he could no longer do, and referenced losing his job and hurting his hands.  (Tr. 435.)

Based upon this examination, Dr. Schneider diagnosed Flores with major depressive

---

[2]        The Court notes that its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

disorder, secondary to chronic pain, with underlying anxiety. (Tr. 436.) He noted Flores was socially withdrawn and in chronic pain. (Tr. 438, 439.) Dr. Schneider then completed a "Medical Source Statement of Ability to Do Work-Related Activities." He found Flores was 1) mildly limited in his abilities to interact appropriately with co-workers and supervisors; 2) moderately limited in his ability to carry out simple instructions; and 3) markedly limited in his ability to understand and remember simple instructions, and make judgements on simple work-related decision. (Tr. 438-439.) Dr. Schneider also found extreme limitations in the following areas:

- understanding and remembering complex instructions,
- carrying out complex instructions,
- the ability to make complex work-related decisions,
- interacting appropriately with the public,
- responding appropriately to usual work situations and to changes in a routine work setting.

(Tr. 438-439.)

### 2. Physical Impairments

Flores underwent a series of x-rays on January 18, 2012. X-rays of his bilateral calcanei (i.e., heel) revealed calcaneal spurs, but no fracture or dislocation. (Tr. 466.) An x-ray of his lumbar spine indicated degenerative changes at multiple levels with osteophyte formation. (Tr. 467.) On February 27, 2012, Flores saw Sheku Idriss, D.O., and reported back pain, as well as numbness in both hands. (Tr. 337.) On examination, he had tenderness in his back and decreased sensation in his hands. (*Id.*) Dr. Idriss prescribed Celebrex and Tramadol. (*Id.*)

On January 13, 2013, Flores visited Dr. Azra Shaikh, with complaints of back pain and depression. (Tr. 335.) On examination, he had spasms in his back, along with a positive straight leg raise. (*Id.*)

4

Flores visited the Orthopedic Institute of Pennsylvania on March 7, 2013 for an evaluation of his neck, middle, and lower back pain. (Tr. 356). He reported numbness and tingling in his hands, and back pain radiating into his thighs. (*Id*.) Danielle Miller-Griffie, PA-C examined him. Flores was able to rise from the seated position without difficulty, and his gait and coordination were grossly normal. (*Id*.) He had discomfort with palpation in the thorcolumbar area, decreased sensation in his fingers, and negative straight leg raises. (*Id*.) He was able to heel and toe walk, without weakness. (Tr. 357.) Ms. Miller-Griffie, PA-C recommended he wear night splints for his carpal tunnel syndrome, undergo physical therapy for his back and neck pain, and take Mobic for pain control. (*Id.*)

Flores returned to Dr. Shaikh on March 26, 2013. (Tr. 330). He requested a referral for an MRI of his back. (*Id*.) He had tenderness in his upper cervical and thoracic spine, and reported he was currently in physical therapy. (*Id*.) Flores insisted work was triggering his back pain. (*Id*.)

Flores saw Dr. Shaikh again on April 22, 2013. He reported physical therapy was not helpful. (Tr. 330.) He indicated he had three sessions of physical therapy, and it made his pain worse. (*Id*.) Dr. Shaikh recommended Flores continue with physical therapy, and prescribed Neurontin. (*Id.*)

On April 23, 2013, Flores returned to the Orthopedic Institute of Pennsylvania. He re-iterated physical therapy and Mobic were not helpful. (Tr. 342.) He indicated the pain was radiating from his lower back to his bilateral thighs. (*Id*.) He reported numbness and tingling in his hands at night, despite the night splints. (*Id.*) On examination, Flores moved about the room normally, his spine was not tender, and he was able to heel and toe walk without weakness. (*Id*.)

He also had good strength in his bilateral extremities. (*Id*.) Ms. Miller-Griffie ordered a lumbar MRI. (*Id.*)

An April 30, 2013 MRI of the lumbar spine revealed mild degenerative disc disease of the lower lumbar spine, with no central canal or neural foraminal stenosis or disc herniation. (Tr. 359.) Flores later underwent an EMG of his bilateral upper extremities on May 3, 2013, which revealed 1) mild to moderate median nerve neuropathy/entrapment at or about the right wrist; 2) mild median nerve neuropathy/entrapment at or about the left wrist; and 3) borderline/mild ulnar nerve entrapment/neuropathy at the right elbow. (Tr. 371.) There was no evidence of bilateral radial or left ulnar nerve entrapment/neuropathy. (*Id*.)

Flores returned to the Orthopedic Institute of Pennsylvania on May 7, 2013. He was still having pain from his neck to his lower back, along with numbness and tingling in both hands. (Tr. 340.) On examination, his gait was normal, he rose from the seated position without difficulty, and was able to heel and toe walk. (*Id*.) He had pain upon palpation in his back and a decreased range of motion in his neck. (*Id*.) Ms. Miller-Griffie reviewed the MRI and also cervical spine x-rays. She noted the cervical spine x-rays revealed maintained vertebral height and good alignment. (*Id*.) She assured Flores there was "nothing bad" on the MRI, and no indication for surgery. (Tr. 341.)

Flores visited the Orthopedic Institute of Pennsylvania on May 20, 2013 for a consultation regarding his arms. Dr. Stephen Dailey, M.D., an orthopedist, was the examiner. (Tr. 343.) Flores reported he was having trouble opening boxes and gripping at work. (*Id*.) Dr. Dailey reviewed the EMG, and noted it was consistent with bilateral carpal tunnel syndrome and possible cubital tunnel syndrome on the right. (*Id*.) He administered an injection into Flores'

6

right wrist, and told him to return in two weeks. (*Id*.)

Flores returned to Dr. Dailey on June 7, 2013. He indicated no relief from the right wrist injection. (Tr. 345.) He was wearing braces on both wrists, and reported his symptoms had not changed despite not working for the past 2.5 months. (*Id*.) On examination, he had a full range of motion in his wrists, and his sensation was intact. (*Id*.) He had diffuse tenderness in his wrists. (*Id*.) Dr. Dailey told him he did not think his carpal tunnel would respond to surgery, and recommended he obtain a second opinion. (*Id.*)

Flores established with primary care doctor Abdulai Bukari, M.D., on June 10, 2013. He reported back and neck pain, and indicated Naprosyn had not been helping. (Tr. 411.) On examination, Flores' entire spine and left trapezoids were tender. (Tr. 412.) He had no muscle atrophy, and the grip in his left hand was slightly weak. (*Id*.) Dr. Bukari prescribed Flexeril and ordered a cervical spine x-ray. (*Id*.)

Flores sought a second opinion regarding his arms from orthopedist Robert Maurer, M.D., on June 17, 2013. He was wearing bilateral wrist splints, and indicated they were helpful. (Tr. 387.) On examination, Flores had normal motion in his neck. (Tr. 388.) Both arms had positive median nerve compression tests, positive Tinel's signs, and positive Phalens' tests. (*Id*.) Dr. Maurer told Flores his right cubital tunnel syndrome symptoms were not severe enough for surgery, but did recommend carpal tunnel syndrome procedures on both wrists. (*Id*.) On this date, Dr. Maurer also filled out a form which indicated Flores was able to return to work on June 17, 2013, but "with no constant, repetitive, motion." (Tr. 407.)

Flores underwent a right-sided carpal tunnel release on June 20, 2013. (Tr. 379.) He followed up with Dr. Maurer on June 26, 2013. He still had some stiffness, but was healing well,

and some of the pain had improved.  (Tr.  385.)  Flores continued to have left hand pain,

however, Dr. Maurer scheduled him for a left carpal tunnel release.  (Tr. 386.)

Flores returned to Dr. Maurer on July 3, 2013.  His preoperative numbness had resolved,

though he still had stiffness in his digits.  (Tr. 383.)  Flores indicated he was not ready for left

hand surgery.  (*Id*.)  Dr. Maurer recommended he have a month of physical therapy for his right

hand, and then have his left carpal tunnel procedure.  (*Id.*)

Flores underwent right hand physical therapy from July 29 – August 13, 2013, totaling 14

visits.  (Tr. 391.)  He made little progress on most of his therapy goals.  (*Id*.)  Flores did have

decreased numbness, but was still having high levels of pain.  (Tr. 392.)  He also had edema.

(*Id*.).

Flores returned to Dr. Maurer's office on August 14, 2014.  Dr. Maurer told him it was

normal to still have some pain and swelling in the right hand, and  noted Flores' paresthesia had

largely resolved on the right hand.  (Tr. 381.)  Flores reported persistent symptoms on his left,

and Dr. Maurer told him to schedule a left-sided carpal tunnel release in the near future.  (*Id*.)

Dr. Maurer opined Flores "may continue to work light duty, one-handed work, using his right

hand at this time until surgery on the left."  (*Id*.)

On August 21, 2013, Flores presented to Dr. Bukari.  He reported neck pain and left thigh

pain.  (Tr. 410.)  His entire spine was tender, as was his left thigh. (*Id*.)  Dr. Bukari renewed

Flores' prescriptions for Flexeril and Naprosyn.  (*Id*.)  She also ordered a cervical spine x-ray,

which revealed mild degenerative disc disease and cervical spondylosis.  (Tr. 411, 414.)

On November 11, 2013, Flores saw Dr. Michael Darowish, M.D., in consultation for his

right arm pain.  He reported increasing pain and numbness since his surgery.  (Tr. 446.)  He

reported his left arm was troublesome, but not as much as his right. (*Id.*) On examination, Flores had a positive Tinel's sign, and his right wrist was tender with a color change. (Tr. 447.) Dr. Darowish felt he possibly had reflex sympathetic dystrophy. (*Id.*) He prescribed Neurontin; recommended physical therapy, and ordered a bone scan. (*Id.*) Dr. Darowish opined "given his significant hand dysfunction, I do not think return to work is feasible at present." (*Id.*)

A November 27, 2013 bone scan revealed mild hyperemia on the right hand, most likely reactive due to recent surgery. (Tr. 445.) There were no findings consistent with complex regional pain syndrome. (*Id.*)

In August 2014, Flores began treatment with chiropractor, Curtis Rifle, D.C. (Tr. 485.) Treatment notes indicated he saw Dr. Rifle approximately 13 times between August 22, 2014 and November 10, 2014. (Tr. 481 – 485.) These treatment notes indicate pain and muscle spasm in the lumbar spine. (Tr. 481, 485.) In October 2014, Flores reported pain with walking and standing. (Tr. 484.)

Dr. Rifle filled out a form regarding Flores' limitations on May 4, 2015. He noted he had treated Flores for about a month, and his prognosis was poor. (Tr. 487.) He noted Flores had a reduced range of motion in his lumbar and cervical spine, along with tenderness. (*Id.*) Dr. Rifle then provided the following limitations for Flores:

- He could sit for 15 minutes at a time, stand for 15 minutes at a time, stand/walk for less than two hours in an 8-hour workday, and sit for about two hours in an 8-hour workday.

- He would need a job which permitted shifting positions at will. He would need to walk for five minutes every 15 minutes, and would need to take a 10-15 minute break every hour.

- He does not need a cane to ambulate. He can rarely lift 10 pounds, and never lift 20-50 pounds. He could never twist, bend, crouch, squat, climb stairs, or

climb ladders.

- He has significant limitations in reaching, handling and fingering, and would only be able to use his hands/fingers/arms for 10% of the workday.

- He would be off-task more than 25% of the workday.  He would miss about three days of work per month.

(Tr. 488 - 490.)

On April 20, 2015, Flores began treatment with podiatrist Munketh Salem, DPM.  Flores reported bilateral heel pain for the past three years, and worsening pain in the past two months.  (Tr. 496.)  Dr. Salem reviewed his old x-rays, which indicated bilateral heel spurs.  (*Id*.)  Flores reported he was taking Tramadol as needed for pain, and could not be on his feet for long periods.  (*Id*.)  On examination, he had full strength in his feet and ankles, and full, active range of motion in his feet. (Tr. 497.)  He had pain with palpation, and mildly limited dorsiflexion in the ankle.  (*Id*.)  Dr. Salem prescribed Flores a short course of steroids and therapeutic exercises.  (Tr. 498.)  He also submitted requests to Flores' insurance for orthotics.  (*Id*.)

Flores returned to Dr. Salem on May 4, 2015.  Dr. Salem injected Flores' left plantar heel, and told him to continue with daily stretching.  (Tr. 494.)  He told Flores if his symptoms did not improve, he would need to go to physical therapy.  (*Id*.)

**C.**     **State Agency Reports**

**1.**     **Mental Impairments**

On December 18, 2013, state agency psychologist Francis Murphy, Ph.D., reviewed Flores' records and completed a "Psychiatric Review Technique."  (Tr. 95.)  Dr. Murphy determined Flores had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence,

and pace, and no repeated episodes of decompensation. (*Id.*) Dr. Murphy also completed a "Mental Residual Functional Capacity ("MRFC") Assessment. (Tr. 98.) He determined Flores was "capable of engaging in simple, repetitive work activities on a sustained basis." (Tr. 99.)

**2.      Physical Impairments**

On October 2, 2013, Catherine Ugarte, a single decision maker[3], reviewed Flores' records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 97.) Ms. Ugarte determined Flores could occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds; stand and/or walk for a total of 6 hours in an 8-hour workday; and sit for a total of 6 hours in an 8-hour workday. (*Id.*)

**D.      Hearing Testimony**

During the May 8, 2015  hearing, Flores testified to the following:

- His highest level of education is the 11th grade. He did not graduate high school. He is unable to read, speak, or write in English. He is able to read, speak, and write in Spanish. (Tr. 52.)

- He lives with his girlfriend. (Tr. 50.) He does not have a drivers' license, and he uses public transportation. (Tr. 51.) His girlfriend helps him get dressed and bathes him. (Tr. 74.) His girlfriend does the household chores. (*Id.*)

- He is right-handed. (Tr. 50.) He does not feel he can work due to issues with his right hand. He had surgery on his right hand, and subsequent to this procedure, developed complex regional pain. (Tr. 59.) He is going to receive intensive treatment at the Cleveland Clinic, but it has not yet been scheduled. (Tr. 65, 66.)

- He cannot make a fist or hold anything with his right hand. (*Id.*) He is not

---

[3]      The single decision maker model is a program offered in the Social Security Administration. Under this program, a "single decision maker" ("SDM") has primary responsibility for processing applications for disability, including making an initial disability determination. *See* 20 C.F.R. §416.1406(b)(2). A SDM is an individual with no medical credentials. *Messina v. Comm'r of Soc. Sec.,* 2015 WL 418014 at fn. 8 (S.D. Ohio Jan. 30, 2015).

having any problems with his right shoulder, but has problems with his right elbow down to his fingers.  (Tr. 60.)

- He also has problems with his left arm. (*Id*.)  He does not have as much strength in his left arm as he did before.  He can hold things in his left hand, and is able to make a fist with his left hand.  (Tr. 61.)  He also has left shoulder pain and neck pain.  (Tr. 61.)  He feels he is getting pain in his left arm and hand because of overuse, since he cannot use his right arm. (Tr. 66.)

- He has scoliosis and disc problems in his lower back.  (Tr. 63.)  His entire back hurts.  (*Id*.)  His thighs go numb.  (Tr. 64.)  His left leg hurts.  (Tr. 66.)

- He has a heel spur in his left foot.  (*Id*.)  He has received injections for this issue.  (Tr. 65.)

- He can walk for a block and a half.  (Tr. 71.)  He can carry a small grocery bag, but he cannot carry anything with his right arm at all.  (*Id*.)

- He takes medication for depression, and it helps a little.  (Tr. 67.)  He has poor sleep due to his pain. (Tr. 68.)  He sees a psychiatrist once a month.  (Tr. 70.)  His depression is getting worse, and some days he does not come out of his bedroom.  (*Id*.)  He has problems with attention, concentration, and decision-making.  (Tr. 72.)  He does not have friends, but he gets along with his girlfriend.  (Tr. 72, 73.)

The VE testified Flores has past work as a hand packager (D.O.T. #920.587-018), gas station attendant (D.O.T. #915.467-010), and construction worker II (D.O.T. #869.687-026). (Tr. 78.)  The ALJ then posed the following hypothetical question:

Please assume a hypothetical individual of claimant's age, education, and work experience you just described.  The first is at the medium level of exertion, and in addition to the medium[4] exertion, mental limitations of limited to perform simple,

---

[4]  "Medium work" is defined as follows: "medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine he or she can also do sedentary and light work." 20 CFR § 404.1567(c). Social Security Ruling 83–10 clarifies that "a full range of medium work requires standing and walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting and carrying objects weighing up to 25 pounds." SSR 83–10, 1983 WL 31251 (1983).

routine, and repetitive tasks.  Occasional contact with supervisors and co-workers.  No contact with the public.  And when I say occasional, I mean no negotiation, mediation, confrontation.  Interactions less than five minutes.  Work related.

(Tr. 78-79.)

The VE testified the hypothetical individual would be able to perform his past work as a hand packager.  (Tr. 79.)  The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as laundry worker II (medium, unskilled, SVP 2); kitchen helper (medium, unskilled, SVP 2); and cook helper (medium, unskilled SVP 2).  (*Id.*)

The ALJ then asked the VE to consider the same hypothetical, except the individual would be restricted to the light[5] exertional level, and additionally be limited to frequent right and left hand controls and frequent bilateral handling and fingering.  (Tr. 80.)  The VE testified the hypothetical individual could not perform any past work, but could perform the jobs of a cafeteria attendant (light, unskilled, SVP 2); cleaner, housekeeping (light, unskilled, SVP 2); and cleaner and polisher (light, unskilled, SVP 2).  (Tr. 80-81.)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v.*

---

[5]    "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

*Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant, Carlos Cebollero Flores, has not engaged in disqualifying substantial gainful activity at any time since the June 21, 2013 alleged onset date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following "severe" medical impairments since the June 21, 2013 alleged onset date: bilateral carpal tunnel syndrome, bilateral heel spurs, lumbar degenerative disc disease, and an affective disorder (20 CFR 416.920(c)).

3.    Since the June 21, 2013 alleged onset date, the claimant has not had an impairment, or a combination of impairments, that has met or medically equaled the severity of any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.    With the exception of briefer periods of less than 12 continuous months, the claimant has retained the residual functional capacity since the June 21, 2013 alleged onset date to perform all the basic work activities described in 20 CFR 416.921 and 416.945 subject to the following restrictions/limitations: he can lift, carry, push, and/or pull forces and/or weights of up to 10 pounds frequently and up to 20 pounds occasionally; and he can sit with normal breaks for six hours in an eight-hour period; and he can stand and/or walk with normal breaks for six hours in an eight-hour period; and he can frequently (as compared to constantly) operate hand controls, and he can frequently handle and/or finger objects.  However, the claimant has not been able to climb ladders or scaffolds.  The claimant has also been limited to performing simple, routine, and repetitive tasks in jobs where he does not have to interact with co-workers and/or supervisors more than occasionally, and in jobs where his interactions with co-workers and/or supervisors do not require him to negotiate with others, engage in mediation with others, or confront others.

5.    The claimant has been unable to perform any of his past relevant work since the June 21, 2013 alleged onset date (20 CFR 416.965).

6.    The claimant has been considered to be a person [sic] a younger individual in the "18 to 49" age group ever since the June 21, 2013 alleged onset date (20 CFR 416.963).

7.    The claimant has a limited education, and he cannot communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant's past relevant work consisted of unskilled work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).[6]

10. The claimant, Carlos Cebollero Flores, has not been under a disability, as defined in the Social Security Act, at any time between the June 21, 2013 alleged onset date and the date of this decision (20 CFR 416.920(g)).

(Tr. 30-38.)

# V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are

---

[6]  The Court notes the jobs the ALJ found Flores could perform in the body of his decision are not the jobs which the VE testified Flores could do for that particular hypothetical individual. The ALJ listed three medium exertional level jobs in the decision, while the VE actually provided three different light exertional level jobs for Flores' residual functional capacity. (Tr. 38, 79, 80.) Neither party has raised this issue or argued it is an error. The Court deems the argument waived and will not address it further.

supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough

evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.**      **First Assignment of Error: Residual Functional Capacity**

In his first assignment of error, Flores argues the ALJ's RFC is not supported by substantial evidence.  (Doc. No. 11 at 10.)  Specifically, Flores argues the ALJ: 1) failed to consider the medical evidence as a whole; 2) improperly rejected statements by his treating physician; 3) improperly rejected statements by his treating chiropractor; 4) failed to discuss evidence from an unidentified "Social Security reviewing physician"; 5) failed to identify medical evidence supporting the residual functional capacity; and 6) improperly failed to give greater consideration to his hand limitations.  (*Id*. at 10, 13, 14)  Since Flores has raised a host of arguments regarding the formulation of the RFC, the Court will address each of these arguments in turn below.

### *a. Consider the evidence as a whole/Identify medical evidence supporting the RFC*

Flores argues the ALJ "erred by selectively focusing on the absence of significant pathology, the absence of surgery for his left carpal tunnel syndrome, and little treatment for his

podiatric problems." (Doc. No. 11 at 11.) Thus, Flores contends, the ALJ conducted a selective analysis of the medical evidence, and formulated an RFC not supported by substantial evidence. (*Id.*) Flores further argues the ALJ did not identify the evidence which supported the residual functional capacity determination. (*Id.* at 12.)

The Commissioner argues the ALJ's discussion in the decision demonstrated he weighed all the relevant evidence in Flores' file. (Doc. No. 13 at 9.) The Commissioner notes the ALJ is not required to discuss "each piece of data" in the opinion. (*Id.*) She asserts the ALJ properly analyzed Flores's subjective complaints, as well as the medical records, opinion evidence, and other evidence contained in the record. (*Id.*) Further, the Commissioner argues the ALJ properly identified and cited the evidence upon which he relied upon in assessing the RFC. (*Id.* at 11.)

The ALJ is obligated to consider the record as a whole. *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir.1985). It is essential for meaningful appellate review that the ALJ articulate reasons for crediting or rejecting particular sources of evidence. *Morris v. Sec'y of H.H.S.*, No. 86–5875, 1988 WL 34109, at *2 (6th Cir. April 18, 1988). Otherwise, the reviewing court is unable to discern "if significant probative evidence was not credited or simply ignored." *Id.* (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981)). The ALJ need not provide a "written evaluation of every piece of testimony and evidence submitted. However, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Id.* (quoting *Cotter*, 642 F.2d at 705). An ALJ "cannot 'pick and choose' only the evidence that supports his position." *Kester v. Astrue*, No. 3:07cv00423, 2009 WL 275438, at *9 (S.D. Ohio Feb.3, 2009) (citing *Loza*

*v. Apfel*, 219 F.3d 378, 393 (5th Cir.2000); *Switzer v. Heckler*, 742 F.2d 382, 385–86 (7th Cir.1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y.2002)).  However, an ALJ is not required to provide detailed evaluation of every piece of evidence contained within the record.  Rather, the ALJ is charged with providing *minimal* articulation of their assessment of the evidence.  *See Morris,* 1988 WL 34109, at *2.

Moreover, an ALJ must provide a discussion at each step "in a manner that permits meaningful review of the decision." *Boose v. Comm'r of Soc. Sec.,* 2017 WL 3405700 at *7 (N.D. Ohio June 30, 2017) (quoting *Snyder v. Comm'r of Soc. Sec.,* 2014 WL 6687227 at *10 (N.D. Ohio Nov. 26 2014).  This discussion must "build an accurate and logical bridge between the evidence" and the ALJ's conclusion.  *Snyder v. Comm'r of Soc. Sec.,* 2014 WL 6687227 at *10 (N.D. Ohio Nov. 26, 2014) (quoting *Woodall v. Colvin,* 2013 WL 4710516 at *10 (N.D. Ohio Aug. 29, 2013).

The Court finds the ALJ properly discussed the evidence and made a clear connection between the RFC and his discussion.  In the decision, the ALJ reviews Flores' allegations in detail, citing each exhibit Flores made his various allegations.  (Tr. 34.)  The ALJ contrasted these allegations with the minimal findings on the diagnostic imaging contained in the record, as well as the objective findings upon examination.  (Tr. 35.)  The ALJ cited these findings with specificity.  (*Id.*)  The ALJ noted Flores had little treatment for his podiatric problems, and no muscle atrophy in his arms or legs.  (*Id.*)  The ALJ also discussed the lack of a pain management program and Flores' failure to undergo a left carpal tunnel release.  (Tr. 35, 36.)  The ALJ also evaluated Flores' reported activities of daily living, noting his abilities to use public transportation, manage money, shop, and watch television. (Tr. 35.)  While the ALJ did not

discuss each piece of evidence contained in the record, he is not required to do so.

Further, in support of the RFC, the ALJ acknowledged the treating source opinions, and even accounted for some of the manipulative limitations provided by Flores' orthopedist. (Tr. 36.) He noted Flores required right carpal tunnel surgery, and needed left carpal tunnel surgery. (Tr. 35.) The ALJ acknowledged one physician had raised the possibility of a reflex sympathetic dystrophy diagnosis. (Tr. 30.) The ALJ then explained his rejection of this diagnosis, nothing the negative diagnostic testing in November 2013. (*Id.*)

The ALJ's analysis of the records are supported by substantial evidence. Flores has consistently reported neck and lower back pain, but the objective findings have been minimal. In March 2013, he was able to arise from a seated position without difficulty, and his gait and coordination were grossly normal. (Tr. 356.) He could heel and toe walk without weakness. (Tr. 357.) In April 2013, he had good strength in both legs. (Tr. 342.) A lumbar spine MRI indicated mild degenerative disc disease, but no stenosis or herniation. (Tr. 359.) Cervical spine x-rays revealed maintained vertebral height and good alignment, with mild degenerative changes (Tr. 314, 340.)

As for his hands, a May 2013 EMG of the bilateral upper extremities confirmed bilateral carpal tunnel syndrome and right cubital tunnel syndrome. (Tr. 371, 343.) Dr. Maurer, his orthopedist, did not feel his right cubital tunnel syndrome warranted surgery, but he did recommend bilateral carpal tunnel releases. (Tr. 388.) Flores subsequently underwent a right carpal tunnel release procedure in June 2013. (Tr. 379.) By July 2013, his preoperative numbness had resolved. (Tr. 383.) In August 2013, Flores had continued pain in his right wrist, but Dr. Maurer reassured him this was normal. (Tr. 381.) Flores did not undergo the left carpal

tunnel release recommended by Dr. Maurer. (Tr. 381, 383.) Flores consulted with Dr. Darowish in November 2013, indicating increasing pain in his right hand since his procedure. (Tr. 446.) He indicated his left arm was not as troublesome as the right. (*Id*.) Dr. Darowish felt his symptoms were likely related to reflex sympathetic dystrophy, but a bone scan was negative. (Tr. 445, 447.)

Although Flores cites evidence from the record he believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003). In the instant case, the ALJ clearly articulated his reasons for finding Flores capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence.

### b. Dr. Maurer, treating orthopedist

Flores argues the ALJ improperly evaluated the opinions of his treating orthopedist. (Doc. No. 11 at 11.) Specifically, he asserts the ALJ failed to articulate "good reasons" for according only "some weight" to those opinions. (*Id.*) Citing the medical evidence, Flores argues his orthopedist's opinion he was limited to one-handed work until he received surgery on his left hand are consistent with the other evidence in the record. (*Id*. at 12.) The Commissioner

did not address this argument in her brief.[7]  (*See* Doc. No. 13.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[8]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[9]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to

---

[7]    In the Commissioner's defense, although Flores raised this issue, he provided minimal analysis, which is scattered throughout his brief.

[8]    Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[9]    Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[10]

---

[10] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As an initial matter, the Court notes Flores did not specify which orthopedist, or even which opinion, he was discussing in his brief. (*See* Doc. No. 11.) Upon careful review of the ALJ decision and the record, it appears Flores is referring to the June 17, 2013 and August 14, 2013 treatment notes from Dr. Maurer. (Tr. 36, 381, 407.) On June 17, 2013, a few days before performing Flores' right carpal tunnel release, Dr. Maurer filled out a form entitled "Certificate For Return To School or Work." (Tr. 407) On this form, Dr. Maurer indicated Flores was "able to return to school/work on 6/17/13," but with the limitations of "no constant, repetitive

motions." (Tr. 407.) On August 14, 2013, Dr. Maurer noted Flores "may continue to work light duty, one handed work, using his right hand at this time until surgery on the left." (Tr. 381.)

At step four of the sequential evaluation, the ALJ weighed Dr. Maurer's[11] opinions as follows:

> I have considered the medical source opinions that have been offered in this matter. More specifically, I have considered, and given some weight to, a treating physician's statement on August 14, 2013 that, at that time, the claimant was not able to perform work where he would have to use his left upper extremity (see Ex. 4F, p. 13). However, in light of the longitudinal record including the evidence referenced in this decision, I reject arguments that this source's opinion on this point related to any continuous 12 month period since the June 21, 2013 alleged onset date. I have also considered and given weight to this source's opinion that the claimant was able to return to work on June 17, 2013 provided he did not have to engage in "constant repetitive motions" (see Ex. 4F, p.39).

(Tr. 35.)

> The ALJ assessed the following RFC:

> With the exception of briefer periods of less than 12 continuous months, the claimant has retained the residual functional capacity since the June 21, 2013 alleged onset date to perform all the basic work activities described in 20 CFR 416.921 and 416.945 subject to the following restrictions/limitations: he can lift, carry, push, and/or pull forces and/or weights of up to 10 pounds frequently and up to 20 pounds occasionally; and he can sit with normal breaks for six hours in an eight-hour period; and he can stand and/or walk with normal breaks for six hours in an eight-hour period; and he can frequently (as compared to constantly) operate hand controls, and he can frequently handle and/or finger objects. However, the claimant has not been able to climb ladders or scaffolds. The claimant has also been limited to performing simple, routine, and

---

[11] The Commissioner does not contest Dr. Maurer constituted a "treating physician" when he rendered his opinions regarding Flores' hand limitations. At the time of his June 17, 2013 opinion, he had only seen Flores for *one* office visit. (Tr. 387, 407.) At the time of the August 14 2013, he had performed a right carpal tunnel release on Flores, and saw him on at least five occasions. (Tr. 387, 379, 385, 383, 381.)

> repetitive tasks in jobs where he does not have to interact with co-workers and/or supervisors more than occasionally, and in jobs where his interactions with co-workers and/or supervisors do not require him to negotiate with others, engage in mediation with others, or confront others.

(Tr. 33.)

In determining whether the ALJ properly evaluated the two opinions of Dr. Maurer, the Court first notes the RFC adopted (or was not inconsistent with) the specific functional limitation assessed by Dr. Maurer in the June 17, 2013 treatment note. Specifically, Dr. Maurer found Flores could return to work, but limited him to no "constant, repetitive motions" in the June 17, 2013 treatment note. (Tr. 407.) In the RFC, the ALJ found Flores could "frequently (as compared to constantly) operate hand controls, and can frequently handle and/or finger objects." (Tr. 33.)

Despite Flores' arguments that his "hand limitations existed for more than twelve months" and the ALJ "failed to articulate a good reason for rejecting" Dr. Maurer's opinions (Doc. No. 11 at 12.), it appears the ALJ did, in fact, agree a hand limitation existed for more than 12 months. At step two, the ALJ listed carpal tunnel syndrome as a severe impairment. (Tr. 30.) At step four, the ALJ then reflected manipulative limitations in the residual functional capacity to account for Flores' carpal tunnel syndrome. (Tr. 33.) These limitations are consistent with the limits provided by Dr. Maurer in his June 17, 2013 treatment note. As such, the Court rejects Flores' argument that the ALJ improperly rejected this opinion.

The RFC conflicts, however, with Dr. Maurer's August 14, 2013 opinion, which limited Flores to light duty, "one handed work, using his right hand at this time until surgery on the left." (Tr. 381.) The Court finds the ALJ did not err when evaluating this opinion. In assigning "some weight" to Dr. Maurer's opinion, the ALJ addressed the consistency and supportability of the

opinion, noting it conflicted with the "longitudinal record including the evidence referenced in this decision." (Tr. 36.)  The ALJ also specifically rejected the proposition Flores' left arm limitation related to any continuous 12-month period since the alleged onset date. (*Id*.)

The Court agrees that, taken alone, it would be questionable whether this statement satisfies the "good reasons" requirement of the treating physician rule.  However, reading the ALJ decision as a whole, it is clear the ALJ thoroughly evaluated the evidence.

Specifically, the ALJ discussed Flores' allegations regarding both of his hands, and acknowledged Flores allegation he cannot use his hands for most activities. (Tr. 34.).  The ALJ also acknowledged Flores' impairments likely interfered with his ability to lift and handle objects. (*Id*.)  The ALJ noted correctly, however, that Flores had normal strength and sensation, and no muscle atrophy, in his upper extremities upon examination. (Tr. 32, 35.)  The decision also specifically notes Flores underwent right carpal tunnel surgery, and subsequently reported relief. (*Id*.)  The ALJ then observed noted Flores had not yet elected to have surgery for his left carpal tunnel syndrome. (*Id.*)

If the ALJ had discussed this evidence immediately after weighing Dr. Maurer's opinion, it would be irrefutable the ALJ provided "good reasons" for affording it less than controlling weight.  However, remand is not required where an ALJ did not analyze the medical evidence for a second time when assessing an opinion.  *See e.g., Ellis v. Comm'r of Soc. Sec*., 2015 WL 6444319 at * 15-16 (N.D. Ohio Oct. 23, 2015); *Hanft v. Comm'r of Soc. Sec*., 2015 WL 5896058 at * 9 (N.D. Ohio Oct. 8, 2015); *Daniels v. Comm'r of Soc. Sec*., 2014 WL 1304940 at * 4 (N.D. Ohio March 27, 2014) ("There is no magic language that an ALJ must use to show that he or she has considered the factors in 20 CFR § 404.1527.  Rather, the ALJ must set forth his or

her supporting reasoning, based on evidence in the record, to allow for meaningful judicial review.")  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)).  *See also Kobetic v. Comm'r of Soc. Sec.*, 114 Fed. App'x 171, 173 (6th Cir. 2004 ) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766, n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) ).

In sum, the ALJ acknowledged Dr. Maurer's opinion and articulated reasons for discounting it, including its supportability and consistency with the other evidence in the record. Since the ALJ had already reviewed the evidence at length in his decision, the justification for these reasons was clear.  This provides a sufficient basis for the ALJ's rejection of Dr. Maurer's opinion, and affords this Court the opportunity for meaningful review.  *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. App'x 462, 472 (6th Cir. 2006) ("The ALJ implicitly provided sufficient reasons for not giving those opinions controlling weight.").

Further, substantial evidence supports the ALJ's finding Dr. Maurer's left hand limitation did not relate to any continuous 12-month period since the alleged onset date.  In June 2013, Dr. Maurer recommended surgery on both wrists.  (Tr. 388.)  Flores underwent a right carpal tunnel release on June 20, 2013.  (Tr. 379.)  Dr. Maurer then scheduled him for a left carpal tunnel release.  (Tr. 386.)  Flores  indicated, however, he was "not ready" for the left hand procedure.  (Tr. 383.)  Up to the date of the hearing, Flores still had not undergone this

procedure.[12]  (Doc. No. 11 at 12.)  Flores did continue to report issues with his hands, but in

November 2013, he indicated his left arm was not as troublesome as his right.  (Tr. 446.)  Indeed,

the record reflects Flores had little to no treatment for his carpal tunnel for over a year.  Thus,

substantial evidence supports the ALJ's conclusion the evidence did not support a finding Flores

could not use his left hand at all for any continuous 12-month period.[13]

While the ALJ could have provided greater explanation and pointed to additional

evidence and reasons for rejecting Dr. Maurer's August 2013 treatment note, the Court finds the

ALJ did sufficiently explained his reasons for rejecting Dr. Maurer's conclusion Flores should

not use his left arm.  Namely, the ALJ properly noted in his decision the fact Flores had not

elected to have surgery on his left arm and had normal strength and sensation in his upper

extremities on examination.  (Tr. 32, 35.)

For the reasons set forth above, the Court finds the ALJ properly evaluated Dr.

Maurer's August 14, 2013 opinion and, further, properly discounted it on the basis of

inconsistency with the medical evidence.

### c. Opinion of Curtis Rifle, D.C.

Flores argues the ALJ failed to properly evaluate the opinion of Dr. Rifle, his

chiropractor.  (Doc. No. 11 at 13.)  Specifically, Flores argues the ALJ "did not provide any

---

[12]  The Court notes it was Flores' own choice to not undergo carpal tunnel surgery on the left hand.  In his brief, Flores does not provide any explanation for his failure to undergo this recommended procedure.

[13]  In light of this evidence, it appears the ALJ construed Dr. Maurer's August 2013 opinion that "he may continue to work light duty, one-handed work, using his right hand at this time until surgery on the left"(Tr. 381.) as more in the nature of a temporary restriction.

adequate rationale beyond his conclusory statement that the chiropractor's opinion was inconsistent with the objective medical evidence and appeared to be based solely on claimant's subjective performance." (*Id.*) Thus, Flores contends, the ALJ deprived the Court of engaging in a meaningful review. (*Id.* at 13, 14).

The Commissioner asserts Dr. Rifle, as a chiropractor, is not an acceptable medical source, and thus, his opinion is not entitled to as much deference as a treating physician. (Doc. No. 13 at 11.) The Commissioner acknowledges the ALJ still was nonetheless required to explain the weight given to Dr. Rifle's opinion, but argues the ALJ did so in the decision. (*Id.*) Further, the Commissioner maintains the ALJ "already discussed the medical evidence supporting his RFC finding, so he was not required to repeat it in dismissing Dr. Riffle's opinion." (*Id.* at 12.)

Under Social Security Regulations, a chiropractor is not an "acceptable medical source" entitled to the type of "controlling weight" an "acceptable medical source" enjoys. *See* 20 C.F.R §§ 416.902(a)(1) - (8), 416.927(a)(1), 416.927(f). However, the regulations also provide these opinions still must be considered, using the same factors listed in 20 C.F.R. §416.927(c). The regulations further provide "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these source or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning." 20 C.F.R. §416.927(f)(1)-(2).

Social Security Ruling 06-03[14] further explains how opinion evidence from "other sources" should be treated. SSR 06-03p provides information from "other sources" (such as a chiropractor) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939 at *2-3 (August 9, 2006). Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03p, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion"). *See also Williams v. Colvin,* 2017 WL 1074389 at *3 (N.D. Ohio March 22, 2017).

As discussed above, Flores' treating chiropractor, Curtis Rifle, D.C. filled out a form regarding Flores' limitations on May 4, 2015. (Tr. 487.) Dr. Rifle provided the following limitations for Flores:

- He could sit for 15 minutes at a time, stand for 15 minutes at a time, stand/walk for less than two hours in an 8-hour workday, and sit for about two hours in an 8-hour workday.

- He would need a job which permitted shifting positions at will. He would need to walk for five minutes every 15 minutes, and would need to take a 10-15 minute break every hour.

- He does not need a cane to ambulate. He can rarely lift 10 pounds,

_____

[14]     The Court notes SSR 06-03p was rescinded on March 27, 2017. This rescission is effective for claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928298 at *1.

and never lift 20-50 pounds. He could never twist, bend, crouch, squat, climb stairs, or climb ladders.

- He has significant limitations in reaching, handling and fingering, and would only be able to use his hands/fingers/arms for 10% of the workday.

- He would be off-task more than 25% of the workday. He would miss about three days of work per month.

(Tr. 488-490.)

In the decision, the ALJ discussed Dr. Rifle's opinion as follows:

I have also considered, but given little weight to, the opinions of a treating chiropractor that are found in Exhibit 14F. Besides not being considered to be an acceptable medical source under Social Security disability law, this source's opinions are not supported by the evidence in this case including the evidence referenced in this decision. For example, there is no basis in this record to support this source's opinion that the claimant could not sit or stand for more than 15 minutes at one time (see Ex. 14F, p.3).

(Tr. 36.)

The Court finds the ALJ's analysis of Dr. Rifle's findings satisfies the regulatory requirements for consideration of opinions from "other sources." The ALJ expressly acknowledged the opinion of Dr. Rifle, and provided several reasons for discounting his conclusions regarding Flores' physical functional capacity. Specifically, the ALJ explained Dr. Rifle was not an "acceptable medical source" under the regulations, and the opinion was not supported by the evidence referenced in the decision. (Tr. 36.) The ALJ then specifically noted the lack of evidentiary support for the sitting and standing limitations assessed by Dr. Rifle. (*Id.*)

In this case, the ALJ discussed the medical evidence prior to evaluating the opinion of Dr. Rifle, noting in particular the lack of "significant pathology" in Flores' back and neck. (Tr. 35.) The ALJ also discussed the objective findings upon examination, including normal strength

and sensation in the upper and lower extremities, normal gait, and the success of the right carpal tunnel procedure. (Tr. 35.) The ALJ further noted Flores had "not yet elected to have surgery for his left carpal tunnel syndrome" and "received little treatment for his podiatric problems." (Tr. 35.) This discussion of the evidence implicitly rejects those portions of Dr. Rifle's opinion which were not incorporated in the RFC, and supports the rejection of the rather extreme sitting and standing limits provided by Dr. Rifle.

Because Dr. Rifle is an "other source," the ALJ was not required to accord any particular weight to his opinions regarding Flores' physical functional limitations, nor was he required to provide "good reasons" for rejecting them. Rather, the ALJ was required only to evaluate Dr. Rifle's opinions using the applicable factors set forth in the regulations. *See Cruse,* 502 F.3d at 541. For the reasons set forth above, the Court finds the ALJ properly evaluated Dr. Rifle's opinion and, further, properly discounted it on the basis of inconsistency with the medical evidence.

### d. Opinion of state agency, dated April 5, 2012

Flores argues the ALJ failed to address an April 5, 2012 opinion of a "Social Security reviewing physician." (Doc. No. 11 at 14.) He notes this opinion conflicts with the RFC, and asserts remand is required because the ALJ failed to address this conflict. (*Id.*)

The Commissioner argues the "opinion" at issue was actually from a single-decision maker, not a reviewing physician. (Doc. No. 13 at 12.) The Commissioner notes a single-decision maker opinion is not "technically evidence, and the ALJ was not required to weigh it." (*Id.*)

"SDM" is an acronym used by the Social Security Administration for the term "Single

Decision Maker" – an individual with no medical credentials. *Messina v. Comm'r of Soc. Sec.,* 2015 WL 418014 at fn. 8 (S.D. Ohio Jan. 30, 2015). The single decision maker program is an experimental program within the Social Security Administration with the objective to streamline the review of disability claims. *White v. Comm'r of Soc. Sec.,* 2013 WL 4414727, at *8 (E.D. Mich. Aug. 14, 2013). Under this program, an "SDM" has the responsibility of processing a claimant's disability application, including making a disability determination. *Id. See* 20 C.F.R. §416.1406(b)(2)-(4).

However, once a disability application reaches the ALJ level, the "SDM's assessment is no longer relevant to the determination of disability." *White,* 2013 WL 4414727, at *8. Agency policy provides a SDM is not an "acceptable non-medical source" and states SDM assessments are "not the opinions of non-medical sources as described" in Social Security Ruling 06-3p. *Id.* Agency policy "clearly states that any findings made by an SDM are not opinion evidence as they do not come from medical sources and they are not opinions of non-physician sources as described in SSR 06-3p." *Id.* Thus, under the Social Security Administration's policy and regulations, "SDM assessments have no place in an ALJ's disability determination." *Id.*

Here, Jennifer Hess, SDM, rendered a disability determination regarding Flores on April 5, 2012. (Tr. 108.) Ms. Hess limited Flores to a range of sedentary work, with occasional climbing of ramps, stairs, ladders, ropes, and scaffolds, and occasional balancing, stooping, kneeling, crouching, and crawling. (Tr. 107-108.) The ALJ did not mention Ms. Hess' assessment in the decision. (Tr. 28-39.)

The Court finds the ALJ did not err in failing to address Ms. Hess' assessment[15]. Ms. Hess is not a medical professional and provided this assessment solely in her capacity as a single decision maker. It was not adopted or affirmed by a physician or other acceptable medical source. Under agency policy, this SDM assessment is not an "opinion" requiring consideration in the ALJ decision. *See White*, 2013 WL 4414727, at *8.

Accordingly, the Court finds the ALJ did not err in failing to address Ms. Hess' April 5, 2012 assessment of Flores' physical limitations.

### *e. Hand limitations*

Flores next argues the ALJ did not properly consider his hand limitations, asserting the evidence contained in the record proves his "hand limitations existed for more than twelve months." (Doc. No. 11 at 12.) He notes Dr. Maurer limited him to one-handed work until he was able to undergo surgery on his left hand. (*Id.*) He further notes treatment records indicated his right hand symptoms had not improved following his carpal tunnel procedure. (*Id.*) Thus, Flores contends the RFC is not supported by substantial evidence, as it did not properly accounted for his hand impairments. (*Id.*)

The Commissioner notes the RFC is subject to a 12-month durational requirement, and argues the bulk of the evidence Flores cites regarding his hands predates the alleged disability onset date. (Doc. No. 13 at 10.) Specifically, the Commissioner notes Flores "relies heavily on

---

[15]  Further, the Court notes even if this was an "opinion," this residual functional capacity assessment is in connection with a prior disability application not before the Court. Flores applied for disability in the application at issue on June 28, 2013. (Tr. 28.) He alleged disability beginning on June 21, 2013. (*Id.*) Thus, the April 5, 2012 single decision maker assessment relates back to a prior application and does not cover the period before the ALJ in the instant matter.

evidence from 2012 and the first half of 2013," despite the fact he alleged a disability onset date of June 21, 2013. (*Id.*) The Commissioner argues the treatment notes indicate a "seventeen-month gap in treatment between November 2013" and April 2015. (*Id.*) The Commissioner argues the "ALJ reasonably interpreted it to mean that Plaintiff's symptoms waned during this period, leaving him able to perform work at a reduced range of light exertion found in the RFC." (*Id.*) The Commissioner concludes this interpretation was reasonable and remand is not warranted. (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

Further, in rendering the RFC decision, the ALJ must "give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue,* 774 F. Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.,* 383 Fed App'x 140, 148 (3rd Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p,

at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, the ALJ determined Flores had the following residual functional capacity:

With the exception of briefer periods of less than 12 continuous months, the claimant has retained the residual functional capacity since the June 21, 2013 alleged onset date to perform all the basic work activities described in 20 CFR 416.921 and 416.945 subject to the following restrictions/limitations: he can lift, carry, push, and/or pull forces and/or weights of up to 10 pounds frequently and up to 20 pounds occasionally; and he can sit with normal breaks for six hours in an eight-hour period; and he can stand and/or walk with normal breaks for six hours in an eight-hour period; and he can frequently (as compared to constantly) operate hand controls, and he can frequently handle and/or finger objects. However, the claimant has not been able to climb ladders or scaffolds. The claimant has also been limited to performing simple, routine, and repetitive tasks in jobs where he does not have to interact with co-workers and/or supervisors more than occasionally, and in jobs where his interactions with co-workers and/or supervisors do not require him to negotiate with others, engage in mediation with others, or confront others.

(Tr. 33.)

The Court finds the RFC is supported by substantial evidence. A review of the record indicates Flores reported numbness and tingling in his hands prior to the alleged onset date. (Tr. 356, 342.) A May 2013 EMG confirmed bilateral carpal tunnel syndrome, mild right cubital syndrome, and no left ulnar nerve entrapment. (Tr. 371, 343.) In June 2013, Flores had positive median nerve compression, consistent with bilateral carpal tunnel syndrome. (Tr. 388.) Dr. Maurer recommended bilateral carpal tunnel surgery. (*Id.*)

38

Flores underwent a right carpal tunnel release on June 20, 2013. (Tr. 379.) By July 3, 2013, he had indicated his preoperative numbness had resolved. (Tr. 383.) Despite recommendations to do so, Flores declined to undergo the same procedure on his left hand. (*Id*.) Flores then had physical therapy on his right hand, and indicated decreased numbness, but high levels of pain and edema in his right wrist. (Tr. 392.) In August 2013, Dr. Maurer, his orthopedist, told him it was normal to still have some residual pain and swelling. (Tr. 381.) He again recommended surgery on his left side. (*Id*.)

Flores then sought a second opinion from Dr. Michael Darowish in November 2013. (Tr. 446.) He relayed he had been having increasing pain and numbness since the operation. (*Id*.) He also reported his left arm was not as bothersome as his right. (*Id*.) Based upon his examination, Dr. Darowish suspected reflex sympathetic dystrophy. (Tr. 447). However, a November 27, 2013 bone scan was consistent with a recent right hand surgery, and revealed no findings associated with complex regional pain syndrome. (Tr. 445.) There were no other treatment notes for the treatment of Flores' hand properly before the ALJ.[16] (Tr. 481-485.)

In the decision, the ALJ considered and discussed Flores' carpal tunnel, his possible reflex sympathetic dystrophy, and his right cubital tunnel syndrome. (Tr. 30, 32, 33, 35, 36.) He specifically noted the negative bone scan and the mild right cubital tunnel findings. (Tr. 30.) He also noted the improvement following the right carpal tunnel syndrome procedure, and Flores' failure to undergo the same procedure on the left. (Tr. 35.) The ALJ even incorporated manipulative limitations provided by Dr. Maurer, the treating orthopedist, into the RFC. (Tr. 33,

---

[16] There were 13 visits to a chiropractor in late 2014, but this did not involve treatment of his hands. (Tr. 481-485).

36.)  While there is evidence Flores' hand symptoms may have fluctuated, the evidence also indicates he had some improvement following his carpal tunnel surgery and went without treatment for over a year.  The ALJ's interpretation of the evidence was a reasonable one, and does not provide grounds for reversal[17].

Accordingly, and for all the reasons set forth above, the Court finds the ALJ's RFC is supported by substantial evidence.  Flores' first assignment of error is without merit.

**B.        Second Assignment of Error: Illiteracy/Vocational Expert Testimony**

In his second assignment of error, Flores argues the ALJ erred in failing to specifically articulate Flores' illiteracy and inability to speak English when posing a series of hypotheticals to the vocational expert.  (Doc. No. 11 at 1.)  Flores argues "the determination that there are jobs that exist in significant numbers . . . is premised upon legal error."  (*Id*. at 14.)  He notes the ALJ presented a hypothetical question without specifying his inability to read or communicate in English, only his educational level.  (*Id*. at 15.)  Flores argues his inability to comprehend work instructions because of a language barrier "is akin to issues of 'marginal education' which may affect the ability to perform a job."  (*Id*. at 16.)  He posits his inability to communicate in English is a "restriction which impacts his ability to engage in substantial gainful activity."  (*Id*.)

The Commissioner argues Flores' illiteracy and inability to speak English were vocational factors incorporated in the hypothetical questions posed to the vocational expert.  (Doc. No. 13 at

---

[17]        Flores also argues the evidence contained in the record proves his "hand limitations existed for more than twelve months."  (Doc. No. 11 at 12.)  However, as discussed *supra*, the ALJ clearly agreed Flores had hand limitations which existed for more than 12 months, as he found carpal tunnel syndrome severe, and added several manipulative limitations in the residual functional capacity.  (Tr. 30, 33.)  Thus, Flores' argument on this issues appears to be based on a misunderstanding of the ALJ's decision.

12.)  She notes the educational categories under the Regulations include both illiteracy and an inability to communicate in English. (*Id.*)  The Commissioner argues the "education categories do not need to be explicitly stated in the hypothetical question because the ALJ asked the vocational expert to assume an individual who shared Plaintiff's vocational factors."  (*Id*. at 13.)  Thus, the Commissioner concludes, since the vocational expert was assuming an individual who shared Flores' education level, the ALJ "was not required to repeat these limitations in his hypothetical question."  (*Id.*)

Under the Regulations, the ALJ will consider the residual functional capacity, along with several vocational factors, in determining disability.  *See* 20 C.F.R. §§416.960, 416.963, 416.964, and 416.965.  These vocational factors include a claimant's age, education, and work experience. *See* 20 C.F.R. §§ 416.963, 416.964, and 416.965.

The ability to communicate in English is relevant to the ALJ's education determination. *Rivera v. Comm'r of Soc. Sec.,* 2014 WL 4956224 at \*13 (N.D. Ohio Sept. 30, 2014).  Indeed, the regulations specifically acknowledge English is the dominant language of the United States, so an individual who does not understand English may encounter difficulty obtaining a job.  *Id.  See also* 20 C.F.R. §416.964(b)(5).  The regulations also specifically note the "term education also includes how well you are able to communicate in English since this ability is often acquired and improved by education."  20 C.F.R. §416.964(b).

The Sixth Circuit has addressed the issue of how specific an ALJ must be in describing a claimant's educational level to a vocational expert.  In *Deaton v. Commissioner of Social Security,* the plaintiff argued a vocational expert's testimony was "deficient inasmuch as the ALJ erred in failing to specifically advise [the vocational expert] of [plaintiff's] reading deficit."  *Deaton v.*

*Comm'r of Soc. Sec.,* 315 Fed. App'x 595, 599 (6th Cir. 2009). The Sixth Circuit found the hypotheticals to be satisfactory, noting for each hypothetical, the ALJ asked the VE to "assume an individual with [plaintiff's] educational background, which necessarily included her limited formal education and reduced reading level." *Id.* The Sixth Circuit further noted the regulations provide that, while illiteracy or the ability to communicate in English may limit a claimant's vocational scope, the "primary work functions in the bulk of unskilled work relate to working with things (rather than data and people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance." *Id.* at 599, 600.

Here, the ALJ elicited testimony from Flores through an interpreter. (Tr. 47.) The ALJ asked Flores what his highest level of education was, and Flores responded the 11th grade, or third year of high school. (Tr. 52.) Flores further testified he could not read, write, or speak English at all. (*Id.*) He testified he was able to read, write, and speak Spanish. (*Id.*) He testified he could do math and count change. (*Id.*) The ALJ also asked Flores if he had any vocational training beyond the 11th grade, Flores responded in the negative. (*Id.*)

After taking Flores' testimony, the ALJ questioned the VE, Paula Zensmeister. (Tr. 77.) Ms. Zensmeister testified she had listened to Flores' testimony regarding his work history. (*Id.*) The ALJ then posed a series of hypothetical questions to Ms. Zensmeister. Prior to the hypotheticals, the ALJ asked Ms. Zensmeister to "assume a hypothetical individual of claimant's age, *education,* and the work experience you just described." (Tr. 78, emphasis added.) The ALJ did not specifically mention Flores' inability to communicate in English during the hypotheticals.

The Court finds the ALJ did not err by failing to specifically articulate Flores' inability to speak English in the hypotheticals posed to the VE. The VE was present when the ALJ, through an

interpreter, took the testimony from Flores regarding his educational level and English-speaking abilities. The ALJ then asked the VE to assume a hypothetical individual with Flores' education. The VE was apprised of Flores' educational level, which under the Regulations, includes the ability to communicate in English. *See* 20 C.F.R. §416.964(b). Under these circumstances, the Court finds the ALJ was not required to repeat Flores specific educational and language capabilities again when posing the hypothetical questions. The Court finds that by simply asking the VE to consider someone with the same educational level as Flores, the ALJ properly addressed the issue. Further, Flores has not demonstrated the jobs provided by the VE require an English speaking or writing ability greater than his own. *See Deaton,* 315 Fed. App'x at 599.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ properly articulated Flores' educational background to the VE. Flores' second assignment of error is without merit.

## C.      Third Assignment of Error: Sentence Six Remand

In his third and final assignment of error, Flores argues this matter should be remanded for further administrative proceedings pursuant to Sentence Six of 42 USC §405(g) because he provided new and material evidence to the Appeals Council from MetroHealth Medical Center. (Doc. No. 11 at 17.) He asserts this evidence was "new" in the sense it was unavailable to him due to several factors. Flores explains he had moved to Ohio and his prior attorney withdrew in October 2014. He argues that combined with his language and mental difficulties, this series of events precluded him from "obtaining the MetroHealth records before the Plaintiff's May 2015 hearing." (*Id.* at 18.) Flores asserts the "timing of the collection of this evidence was not within [his] control and therefore was not available at the time of the hearing." (*Id.*) He concludes he had "established 'good cause'

for his failure to submit the records to the Administrative Law Judge." (*Id.*)

Flores argues this new evidence is material because the ALJ was "influenced by his belief that Mr. Flores' hand impairments had not lasted 12 months and rejected the diagnosis of complex regional pain syndrome." (Doc. No. 11 at 18). Flores notes this new evidence addresses his complex regional pain syndrome, as well as physical and occupational therapy for his hand. (*Id.* at 18, 19.) Flores argues if "the ALJ had known Mr. Flores' hand limitations continued and that he had pain and symptoms restricting use of his hands, it is probable that he would have recognized Mr. Flores' disability." (*Id.* at 19).

The Commissioner argues a remand is not warranted under Sentence Six because the evidence at issue is neither new or material. (Doc. No. 13 at 13.) The Commissioner asserts that, while the evidence documents additional treatment, it also reveals Flores experienced significant gaps in symptoms, "consistent with the ALJ's finding that the Plaintiff did not have greater limitations than those contained in the RFC for at least 12 months." (*Id.* at 13, 14.) The Commissioner emphasizes the burden is on Flores to demonstrate the ALJ would have reached a different conclusion with the new evidence, and concludes Flores cannot do so, as the new evidence is "consistent with the ALJ's finding regarding the duration of Plaintiff's limitations." (*Id.* at 14).

The Sixth Circuit has repeatedly held "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g). *Id. See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of Soc. Sec.*, 529 Fed. Appx. 706, 717

(6th Cir. July 9, 2013) (stating that "we view newly submitted evidence only to determine whether

it meets the requirements for sentence-six remand").  Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before the
> Commissioner of Social Security, but only upon a showing that there is new
> evidence which is material and that there is good cause for the failure to
> incorporate such evidence into the record in a prior proceeding; and the
> Commissioner of Social Security shall, after the case is remanded, and after
> hearing such additional evidence if so ordered, modify or affirm the
> Commissioner's findings of fact or the Commissioner's decision, or both, and
> shall file with the court any such additional and modified findings of fact and
> decision, and, in any case in which the Commissioner has not made a decision
> fully favorable to the individual, a transcript of the additional record and
> testimony upon which the Commissioner's action in modifying or affirming
> was based.

42 U.S.C. § 405(g) (emphasis added).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not

in existence or available to the claimant at the time of the administrative proceeding.' " *Foster*, 279

F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626).  Evidence is "material" only if "there is 'a

reasonable probability that the Secretary would have reached a different disposition of the disability

claim if presented with the new evidence.'"  *Id.* (quoting *Sizemore v. Sec'y of Health & Human

Servs.*, 865 F.2d 709, 711 (6th Cir.1988)).  *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th

Cir.2007) (noting that evidence is "material" if it "would likely change the Commissioner's

decision."); *Courter v. Comm'r of Soc. Sec.*, 2012 WL 1592750 at * 11 (6th Cir. May 7, 2012)

(same).  Evidence is not material if it is cumulative of evidence already in the record, or if it merely

shows a worsening condition after the administrative hearing.  *See Prater v. Comm'r of Soc. Sec.*,----

F. Supp.3d ----, 2017 WL 588496 at * 2 (N.D. Ohio Feb. 14, 2017).  *See also Jones v. Comm'r of

Soc. Sec.*, 336 F.3d 469, 478 (6th Cir.2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have

declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated

condition"); *Deloge v. Comm'r of Soc. Sec.*, 2013 WL 5613751 at * 3 (6th Cir. Oct.15, 2013) (same).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter*, 2012 WL 1592750 at * 11. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)). This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 2012 WL 1592750 at * 11. *See also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant. *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). When a district court grants remand pursuant to sentence six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand [s] for further fact-finding." *Courter*, 2012 WL 1592750 at * 11. *See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also Melkonyan*, 501 U .S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

Flores argues a sentence six remand is appropriate based upon the following evidence.[18] On August 24, 2014 (over nine months *prior* to the May 8, 2015 ALJ hearing), Flores presented to the emergency room, reporting a three-week history of hand pain. (Tr. 504.) He also indicated a secondary complaint of lower back pain. (*Id.*) He reported his pain had been "on and off" for the past two years. (Tr. 503.) The emergency room physicians provided him with a short course of pain medications, and directed him to follow up with a primary care doctor. (*Id.*)

On December 18, 2014, Flores established with pain management physician Preeti Gandhi, M.D. (Tr. 556). Dr. Gandhi noted Flores had been diagnosed with complex regional pain syndrome at the Hershey Medical Center. (*Id.*) Flores reported he had received nerve blocks, which were not helpful. (*Id.*) He denied any recent physical therapy for his back. (*Id.*) He also denied ever being on an antidepressant, and indicated he was waiting on a call back from a mental health clinic. (*Id.*)

On examination, Flores had a painful range of motion in his lumbar spine. (Tr. 558.) His gait was normal, his fine motor coordination was normal, and he had normal strength in his arms and legs. (*Id.*) He had hyperalgesia in the right upper extremity. (*Id.*) Dr. Gandhi noted no significant trophic or color changes, but he did note some weakness in the hands. (Tr. 559.) He provided Flores with a compounding cream for his neuropathic hand pain, and told him they may consider a lidocaine infusion in the future. (*Id.*) He also referred Flores to physical therapy. (*Id.*) For his

---

[18] The Court notes that its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs. The Court further notes that both Plaintiff and Defendant have cited generally to large swaths of evidence in their briefs, totaling nearly 300 pages. (Doc. No. 11 at 17, Doc. No. 13 at 13.) This does not comply with the Court's order, which specifically provides that the brief "shall cite, by exact and specific transcript page number, the pages relating" to the facts at issue. (Doc. No. 4 at 3.) Thus, the Court has only discussed the evidence which has been cited to by either party with specificity in compliance with the order.

complex regional pain syndrome, Dr. Gandhi prescribed Gabapentin and referred him to physical medicine. (Tr. 557.)

On December 19, 2014, Flores presented to the emergency room, reporting two days of diarrhea, weakness, abdominal, and hand pain. (Tr. 587.) He received IV fluids and medications. (Tr. 589.)

On December 29, 2014, Flores had a physical therapy evaluation for lower back pain and a pain in his limb. (Tr. 607.) He reported pain with his daily activities, and indicated his girlfriend did all the housework. (Tr. 608.) He had a loss of motion in his trunk, but his sensation was intact in his legs. (Tr. 609.) He walked into physical therapy independently, and without an assistive device. (*Id.*) His gait was antalgic, and he sat with fair posture. (*Id.*)

Flores then visited the emergency room the same day, reporting lower back pain after carrying his trash cans two weeks prior. (Tr. 616.) He had negative straight leg raises, a normal gait, and 5/5 musculoskeletal strength. (Tr. 617.)

On January 5, 2015, Flores had a physical therapy visit. (Tr. 633.) He demonstrated a very limited tolerance to activity, and was guarded with his movements. (Tr. 634.) His physical therapist noted Flores needed frequent encouragement to increase activity. (*Id.*)

On January 15, 2015, Flores had a consultation with Ann Wise, M.D., for his chronic pain issues. (Tr. 785.) He reported using a cream on his upper extremity and taking Gabapentin. (*Id.*) He relayed he had attended physical therapy four times. (*Id.*) He also indicated he had recently seen a psychiatrist and was prescribed psychotropic medications. (*Id.*) Dr. Wise listed Flores diagnoses as complex regional pain syndrome and adjustment disorder. She ordered labwork. (Tr. 786.)

Flores followed up with pain management on January 16, 2015. Todd Markowski, CNP,

was the treatment provider at the visit.  (Tr. 652.)  Flores reported gradually worsening pain in his right hand and lower back.  (*Id*.)  He indicated his medications were not helpful.  (*Id*.)  Cervical spine x-rays revealed minor degenerative changes.  (Tr. 653.)  Lumbar spine x-rays indicated mild degenerative changes.  (Tr. 654.)  On examination, he had 5/5 musculoskeletal strength in his upper and lower extremities.  (Tr. 655.)  He had edema in his right wrist.  (*Id*.)  Mr. Markowski referred Flores for a lidocaine infusion for his complex regional pain syndrome.  (*Id*.)

Flores attended occupational therapy on January 23, 2015 with Kathy Stroh, PT.  (Tr. 682.) He reported difficulty with putting on his clothing and tying his shoes.  (*Id*.)  He indicated he was using his left hand to feed himself.  (*Id*.)  Ms. Stroh noted "when I put his fingers into a position he is able to hold there some so uncertain if he is not able to due to pain or motivation or other reason." (*Id*.)  She noted his hand forearm was more pink in general.  (*Id*.)

On February 19, 2015, Flores returned to Dr. Gandhi for pain management.  He reported his pain was worsening, and he was taking Paxil for anxiety and depression.  (Tr. 747.)  Dr. Gandhi noted Flores could "really could use a therapist."  (*Id*.)  On examination, Flores was tender to palpation over the paraspinals, and had limited motion on flexion and extension.  (Tr. 749.)  Dr. Gandhi noted Flores was getting a lidocaine infusion the following week, and was not currently taking any medication for pain.  (Tr. 750.)  Dr. Gandhi advised Flores to consider a comprehensive pain program.  (*Id*.).

On March 16, 2015, still nearly two months prior to the ALJ hearing, Dr. Gandhi attempted to administer a lidocaine infusion.  (Tr. 759.)  This procedure was discontinued because Flores began to have side effects a few minutes into the procedure. (*Id*.)

The Court finds Flores has not demonstrated a  sentence six remand is warranted.  As an

49

initial matter, none of the evidence described above is not "new."  All of this evidence predates the May 28, 2015 ALJ decision.  Flores contends this evidence was "unavailable" to him prior to the decision, citing his move to Ohio, his attorney's withdrawal in October 2014, and his language and mental difficulties. ( Doc. No. 11 at 18.)  This argument is not well-taken, however, for the reasons set forth below.

Flores cites his move from Pennsylvania to Ohio as a reason for his inability to obtain the medical records. (*Id.*)  However, Flores does not explain why this would preclude his ability to obtain medical records from MetroHealth.  MetroHealth is a healthcare provider in Ohio, and Flores resided in Ohio when he was obtaining treatment there.  He was not in a situation where he needed to obtain records from a distant location, but from a treatment facility he visited on a regular basis, up until the date of the hearing.

Flores also notes his attorney withdrew on October 10, 2014, and reports it is "unknown how quickly [he] was able to obtain new counsel."  The Sixth Circuit has held even if a "plaintiff may have fared better with retained counsel [it] does not make evidence 'unavailable' as to him." *Glasco v. Comm'r of Soc. Sec.,* 645 Fed. App'x 432, 436 (6th Cir. 2016).  The record indicates Flores understood the importance of obtaining medical records and apprising the Social Security Administration of any updates.  He was able to report his change of address to the agency in April 2014. (Tr. 286.)  During the reconsideration period of the initial denial of benefits, Flores provided the agency with an updated list of treating sources.  (Tr. 280, 281, 282.)  Most importantly, Flores was able to retain new counsel in August 2014.  (Tr. 141.)  His prior counsel then withdrew in October 2014.  (Tr. 143.)  The counsel he retained in August 2014 was present at the hearing.  (Tr. 47.)  Based upon this evidence, it does not appear Flores was unrepresented in the months prior to

his hearing, thus undercutting his argument.

Flores then argues the complication of needing to retain new counsel, combined with his "language and mental difficulties" prevented him from obtaining the records prior to the hearing. (Doc. No. 11 at 18.) However, "as the party who bears the burden of establishing 'unavailability,' plaintiff must do more than 'raise questions' about his capacity to comprehend the nature of the administrative proceedings." *Glasco*, 645 Fed. App'x at 435. Flores points to nothing in the record indicating his mental health or lack of English-speaking abilities prevented him from obtaining records or understanding the need to obtain the records. Flores was able to move to a new state during the relevant period, establish with a new healthcare provider at MetroHealth, and obtain new counsel. Beyond raising the issue in his Brief, Flores does not explain why his mental health or language barrier would make his medical records "unavailable" to him.

The Court does note that, at the hearing, Flores' attorney stated he had "requested on three occasions records from Cleveland Clinic from Metro," including records from Dr. Wise and Dr. Gandhi. (Tr. 48.) Assuming arguendo MetroHealth's failure to provide these records made the newly obtained records "unavailable" to Flores, he fails to establish their materiality.

Flores' materiality argument centers on the ALJ's rejection[19] of the diagnosis of complex regional pain syndrome. (Doc. No. 11 at 18.) The new records indicate Dr. Gandhi, his new pain management doctor, noted he had previously been diagnosed with complex regional pain syndrome. (Tr. 556.) Dr. Wise confirmed this diagnosis in January 2015. (Tr. 786.) However, beyond confirming this diagnosis, the evidence does not contain any diagnostic testing or objective findings

---

[19]     The Court notes the ALJ, in his decision, did not reference a diagnosis of complex regional pain syndrome. Rather, he found reflex sympathetic dystrophy to be non-severe. (Tr. 30.)

which would demonstrate a "reasonable probability" the ALJ would have found Flores disabled had he considered it.  Indeed, Flores' updated spinal x-rays indicated minor and mild findings, and he had full strength in his upper and lower extremities.  (Tr. 653, 654, 655.)  He did have an antalgic gait during a physical therapy session, but he also was walking without an assistive device.  (Tr. 609.)

In his brief, Flores cannot explain how the confirmation of the diagnosis of complex regional pain syndrome, along with some physical therapy and pain management records, would demonstrate a "reasonable probability" the ALJ would have found him disabled.  Nor does he identify any additional limitations he believes should have been included in the RFC as a result of this evidence.

Flores next argues the "ALJ was influenced by his belief Mr. Flores' hand impairments had not lasted 12 months" and the new records showed his "hand limitations continued."  (Doc. No. 11 at 19.)  As noted *supra*, the ALJ did find a severe hand impairment, along with manipulative limitations in the RFC.  He considered Flores' bilateral carpal tunnel syndrome severe, and found he could "frequently (as compared to constantly) operate hand controls, and he can frequently handle and/or finger objects."  (Tr. 30, 33.)  He found the right cubital tunnel syndrome to be non-severe.  (Tr. 30.)

Flores cites a January 2015 occupational therapy visit, where he was having difficulty dressing, dropping things with his left hand, along with decreased range of motion, dexterity, coordination, and sensation.  (Doc. No. 11 at 19.)  However, that same treatment notes also reveals the physical therapist was uncertain as to the etiology of his symptoms, indicating it could be due to "pain or motivation or other reason."  (Tr. 682.)  Moreover, while Flores had some hyperalgesia

in his right arm in December 2014, his fine motor coordination was normal. (Tr. 558.) There are no updated EMG results or other objective testing to indicate a worsening of his condition, which supports a "reasonable probability" the ALJ would have reached a different result. As such, Flores has not established these new records to be "material" for purposes of a sentence six remand.

Finally, Flores has failed to demonstrate "good cause" for failing to acquire and present these treatment notes to the ALJ prior to the hearing. Flores summarily argues he established "good cause" for the failure to present this new evidence, noting "the timing of the collection of this evidence was not within Mr. Flores' control and therefore was not available at the time of the hearing." (Doc. No. 11 at 18).

Flores offers minimal justification for failing to submit this evidence, simply noting his move to Ohio, his attorney's withdrawal in October 2014, and his language and mental difficulties (*Id*.) As discussed above, Flores had an attorney for the entire relevant period, and his language barrier and mental health issues did not prevent him from apprising the Social Security Administration of his change of address and updated list of treating sources. (Tr. 280-282, 286.) These are not "reasonable justifications" for the failure to timely submit these treatment notes to the ALJ, as required under Sixth Circuit case law. *See Foster*, 279 F.3d at 357 (finding that, in order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing for the ALJ.") Thus, the Court finds Flores has failed to satisfy the "good cause" requirement for a sentence six remand.

In sum, the Court finds Flores has failed to carry his burden of demonstrating a sentence six remand is warranted under the circumstances. Accordingly, and for all the reasons set forth above, Flores' third assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 15, 2017

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**